Frost, J.
dissenting. Henry Seabrook, by Gantt & Mortimer, his brokers, made a sale of negroes to the defendant. The only question is, has the defendant paid the purchase money ?
The defendant paid the money to Gantt. Was it paid to Gantt on such conditions and stipulations as made Gantt the agent or depositary of the defendant 1 On the 8th April the defendant settled with Gantt for the purchase. He gave Gantt *172 a check on the Bank of Charleston, payable to Gantt & Mortimer on the 21st April. No funds were provided for the payment of this check, and it was protested. At the time that this check was given, Gantt wrote on the bill of sale (which was then delivered) a receipt for the purchase money, to which he signed the name of the firm, — at the same time Gantt signed an agreement written by the defendant on the bill of sale to this effect, “ I hereby pledge myself to appropriate the proceeds of the sale of the above negroes to the payment of all the liens on them.” Gantt’s agency was created by this instrument, and his duty defined. It has not been disputed that it created a valid legal obligation, and made Gantt liable to Hammond for any misconduct or remissness in the execution of his agency. The duty assumed by Gantt was to appropriate the purchase money which Hammond was to pay to the discharge of all liens on the ne-groes. For this purpose it was necessary that Gantt should retain the money in his own possession and personally discharge the liens. The purchase money was then paid to Gantt on a condition, the performance of which must have been defeated if Gantt paid the money to Seabrook. If Gantt had paid the money to Seabrook, and he had not discharged the liens, and Hammond had been compelled to discharge them, he might have recovered against Gantt the amount so paid. The pledge was Gantt’s individual promise and undertaking to Hammond. The receipt for the purchase money Gantt signed in the name of the firm. The effect of these different signatures was well known to Gantt and to the defendant. The receipt gave to Hammond an acknowledgment of the payment of the purchase money, which made Mortimer liable to Seabrook for the amount, and an acquittance of Hammond from any demand of the price of the negroes by Seabrook ; while, by the pledge, Gantt obligated himself not to pay the money to the firm, nor to Seabrook ; but to retain it himself.
I have thus stated the legal effect of Gantt’s pledge. The correspondence confirms the construction which has been given to it, by showing the concurrence of both Gantt and Hammond *173 in that construction. On the 19th April Hammond writes to Gantt, inclosing a check payable to Gantt (not to Gantt and Mortimer) on the Bank of the State, (not on the Bank of Charleston,) where Hammond had provided funds to meet the check.— In the second letter of this date, Hammond reminds Gantt that he has Gantt’s “ obligation to appropriate the money to pay the liens on the negroes.” Gantt in reply to these letters, writes on the 20th April to Hammond, and informs Hammond that he had promised to pay Brown, the sheriff, the amount of the purchase money, “ being sufficient for all the judgments against Mr. Seabrook, at whose direction I was thus to apply the proceeds.” “ I confess some surprise, after my promise to you that I would see to this matter, at the receipt of your second letter,” — withdrawing the check. In Hammond’s two letters to Gantt, of the 23d April, he says: “ I rely on your understanding the matter, and protecting me from loss” — “ I write to suggest to you the propriety of paying off the oldest judgments and taking assignments of them, either for yourself or me.” “ I would release you of responsibility for an assignment, made to me, to the amount of the purchase money of these negroes.” “ I make the suggestion. You know your own business.” On the 10:h June Gantt writes to Hammond, “ All but one difficulty has been got over, with regard to Seabrook’s negroes. That' I wish you to determine.” This was a judgment of $5000 in favor of Gibbs. In reply to this letter, Hammond writes to Gantt, (June 16), “ It is impossible for me to determine the validity of Gibbs’s judgment.” “ I trust you will not pay over the money till you know all about it.” “ I have only to say again, I trust you will not part with the money, in any way, but such as to render me secure. You hold the stakes, and must see justice done.” On the 14th of October, Gantt writes to Hammond, “ I could not make you an excuse that would satisfy myself.” “Again, I say to you, I can make you no excuse.” “ As to agency, I agree with you fully, that I, in no sense, was your agent, except so far as my obligation to you went to see that the property was clear before it was paid for, and which Í regret now that you required.” *174 In this extract we have the agreement of Hammond and Gantt on the construction of his pledge, that it imposed on Gantt the obligation to see that the property was clear before it was paid for. In Hammond’s letter to Seabrook, (June 29, 1843,) after adverting to some proposed arrangement respecting the liens, he says : “ relying on Gantt’s assurances and obligation in writing, I did not enquire into the particulars referring to Gantt’s letter about Gibb’s judgment, Hammond further says: “ knowing nothing of the facts, except from his statement, and that not being satisfactory, I declined deciding anything about it; and replied by requesting him not to run any risk in the matter for me; and saying that I would not authorize him to pay the money, until he was perfectly satisfied.” Here we have the explicit declaration of Hammond, that the money was paid to Gantt, to be retained for his, Hammond’s, security until the liens on the negroes were discharged; and his clear admission that on Gantt’s consulting him respecting one of the liens, he, not being satisfied, refused to authorize Gantt to pay the money to Seabrook until Gantt was satisfied that he was perfectly safe.
A reference to Gantt’s testimony will show how strictly he complied with the obligations of his agency for Hammond. In answer to the 9th interrogatory, he says: “I received the money,” “ and put it to my credit; having promised Hammond not to pay it (that is to Seabrook) ’till the judgments against Seabrook were satisfied.” To the 10th, “ I did not pay it to Mr. Seabrook, for the reasons above given, at the time that he demanded payment. It was applied to my individual use, most improperly.” To the 15th, “Mr. Seabrook and Mr. Wilson called at the office of Gantt & Mortimer for the money after I received it.” “ I told them the money would be paid when the judgments were satisfied. I think Mr. Wilson asked me if I was then the agent of Mr. Hammond — I told him I was so far his agent that I had promised to see that the judgments were satisfied before I parted with the money.” To the 8th cross interrogatory, “Mr. Seabrook and Gov. Wilson called together, and 1 said to them, I had promised Gov. Hammond to hold the *175 money till the judgments were satisfied. 1 felt bound to do so, in accordance with my promise to him.”
The pledge and the correspondence present written evidence of the appointment of Gantt to be the agent of Hammond in the settlement for the purchase of the negroes, and the duties which Gantt assumed by that agency. The terms of the pledge are not in the least varied by the correspondence. Both Gantt and Hammond refer to that pledge as the instrument of contract between them. They both agree that it imposed on Gantt the duty of holding the money, for the security of Hammond, until the liens on the negroes were discharged; and that Gantt was bound, by his undertaking, not to pay the purchase money to Seabrook until that was done. All the acts and declarations of Gantt and of Hammond are in complete accordance with the obligation which the pledge imposed. The whole contract is, then, in writing. The effect and obligation of the contract is a question of law for the court, and not of fact for the jury.
Hammond has got Seabrook’s negroes under a contract of purchase. If he has not paid Seabrook for them, he is liable, in this action, at the suit of the executrix of Seabrook. If the deposit of the money in Gantt’s hands, to be held by him unti 1 the liens on the negroes were discharged, is not a payment to Seabrook, then Seabrook was not paid. A tender, on condition, is not a legal tender. The person making the tender must surrender all control over the subject. He retains a control when he requires the performance of a condition. A sale of goods is not complete without delivery — nor is a payment of money. If the goods be not delivered, although all the terms of the contract are settled, no title passes to the purchaser. They are at the risk of the vendor, whether they perish or be destroyed, or be lost by the insolvency of the bailee, in whose custody they are. The same principle applies to the payment of money. The necessity of delivery is not an artificial, technical rule of law, but one derived from and adapted to the ordinary transactions of life. It refers for its authority to the reason and common sense of mankind. But one case may be cited. Bentall vs. Burn, (3 *176 B. & C. 423.) It was a sale of nine hogsheads of Wine in the London docks, with an order from the seller to the purchaser for delivery. It was held, that the delivery and transfer of the title were not complete until the dock company accepted the order, and thereby assented to hold the same as the agents of the buyer. The dock company held the Wine originally as the agents of the vendors; and as long as they continued so to hold it, the property was unchanged. The money was in Gantt’s hands as the agent of Hammond. Hammond gave Seabrook no order for the payment, and of course Gantt accepted no order. Hammond did not even inform Seabrook that Gantt had the money. In Sug. on Vendors, 33, the law is thus stated. A deposit is a payment, in part, of the purchase money; and not a mere pledge. If laid out in the funds, without the consent of the depositor, he is not liable for any depreciation. The deposit remains at the risk of the party making the deposit. He cannot, by depositing his money with his Banker, throw the risk of their credit on the other parties.
But it has been argued that Gantt was directed by Seabrook to discharge the liens on the negroes, and so being the common agent of both Hammond and Seabrook to pay off the liens, the payment to Gantt, by Hammond, for that purpose, was a payment to Seabrook. Seabrook may have directed Gantt to pay off the liens on the negroes, with the purchase money, as Gantt states, in his letters to Hammond; but the whole evidence shews that Gantt disclaimed the agency. He kept the money, six weeks, without informing Seabrook of the payment; and denied to Seabrook that he had received the money. Before this time, Seabrook had, by his attorney, Wilson, cleared up the title, to the satisfaction of Gantt & Mortimer. When Seabrook demanded payment, Gantt refused, on the ground that he was the agent of Hammond to see that the title was cleared of liens ; and that he was bound to Hammond to hold the money until that was done. Gantt never consulted Seabrook about the liens; while he asked for and acted by the direction of Hammond. Hammond assumed to pay off the liens, for his own security; *177 and made Gantt his agent for that purpose. It was Hammond’s money which was paid to Gantt; Gantt was Hammond’s agent; Gantt was to pay off the hens, as Hammond’s agent, and for Hammond’s security, under a personal liability to Hammond to save him harmless. It is vain, against such evidence, to contend that Gantt accepted any agency from Seabrook for the discharge of the liens.
But even if Gantt were Seabrook’s agent, for that purpose ; the question still remains; did Hammondupay the money to Gantt, as the agent of Seabrook,’ to be applied by Gantt, in the discharge of such agency for Seabrook, to the payment of the liens ? Was there any delivery of the money, by Hammond to Gantt, on account of Seabrook ? The agency of Gantt and the conditions on which he received the money from Hammond, are shewn by the terms of the pledge and correspondence. These are wholly unconditional. What constitutes a delivery or payment is a question of. law. When the terms and conditions on which money is received by one person, are reduced to writing, and it becomes a question, whether the money, so received, is a payment to another person ; since the decision of that question depends on the construction of the written instruments, it must be made by the Judge and not by the jury.
It cannot be maintained, on the pledge and correspondence, that Gantt received the money from Hammond, as the agent of Seabrook, or on his account.
The case, on the question of payment, may thus be succinctly stated.
Hammond avers payment. Seabrook never received it. It was paid to Gantt. Gantt & Mortimer were the agents of Sea-brook. Gantt received the money on a pledge, which was, in effect, a pledge not to pay the money to Seabrook. Seabrook and his attorney demanded of Gantt the money; Gantt refused, on the ground, that he was bound to Hammond, not to pay it to Seabrook. Hammond informed Seabrook, by letter, that Gantt was liable to him, on a written obligation, not to pay over the money, unless, in the payment, Hammond was saved harmless; *178 and that Hammond had refused to authorize Gantt to pay the money to him. Hammond, by repeated threats of enforcing Gantt’s liability to him, under the pledge, detained the money in Gantt’s hands, until it was applied to Gantt’s own use ; “ most improperly.” While the money was detained by Gantt, he became insolvent. This statement of the evidence shews, beyond question, that Gantt was not the agent of Seabrook to receive payment for him; and that the payment, made by Hammond, was not received by Gantt on account of Seabrook. Gantt and Hammond both deny that Gantt so received it. Yet the jury have found that Hammond paid the purchase money to Seabrook. I have the clearest conviction that the verdict is against both law and evidence, and should be set aside.
O’Neall, J. concurred.

Motion refused.